UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,

   v.

D-1 Emmanuel Luter,
     a/k/a Stuntman,
D-2 Joseph Ingram,
D-3 Donnell Taylor,
     a/k/a Devin Harris,
     a/k/a Zialou,
D-4 Dominique "Dom" Barnes,
D-5 Delano "Lano" Bush,
     a/k/a Duzz,
D-6 Dalontae Davis,
D-7 Joshua Motley,
     a/k/a Scrap,

        Defendants.
_____/

Case:2:22-cr-20321
Judge: Michelson, Laurie J.
MJ: Grey, Jonathan J.C.
Filed: 06-23-2022 At 10:04 AM
SEALED MATTER (LH)

Violations:  18 U.S.C. § 1349
               18 U.S.C. § 1028A(a)(1)

## INDICTMENT

THE GRAND JURY CHARGES:

### GENERAL ALLEGATIONS

At all times material to the indictment:

    1.    The "Clear Gods" were a group of individuals throughout the Detroit metropolitan area who engaged in a largescale cell phone fraud scheme, stealing the identities of hundreds of real persons, and defrauding dozens of AT&T and Apple stores throughout the United States.

2.   The defendants EMMNAUEL LUTER, JOSEPH INGRAM, DONNELL TAYLOR, DOMINIQUE BARNES, DELANO BUSH, DALONTAE DAVIS, and JOSHUA MOTLEY were residents of the Detroit, Michigan metropolitan area.

3.   The defendants referred to themselves, internally and externally, as the "Clear Gods."

4.   "Clear Gods" is a reference to the process of "clearing" or removing/reversing new service lines and device upgrades from a given cellular account, a key element of the overarching fraud scheme.

5.   AT&T Inc. is a U.S.-based telecommunications company and the largest provider of mobile telephone services in the United States. AT&T Inc. is headquartered in Dallas, Texas

6.   Apple Inc. is a U.S.-based technology company that designs, develops, and sells consumer electronics, including the iPhone family of mobile communications devices. Apple Inc. is headquartered in Cupertino, California.

### COUNT ONE
(18 U.S.C. § 1349 - Conspiracy to Commit Wire Fraud)

7.   Beginning on a date unknown to the grand jury, but at least as early as June 2017 and continuing through at least September 2019, the exact dates being

unknown to the grand jury, in the Eastern District of Michigan and elsewhere, the defendants,

> D-1 Emmanuel Luter, a/k/a Stuntman,
> D-2 Joseph Ingram,
> D-3 Donnell Taylor, a/k/a Devin Harris, a/k/a Zialou,
> D-4 Dominique "Dom" Barnes,
> D-5 Delano "Lano" Bush, a/k/a Duzz,
> D-6 Dalontae Davis,
> D-7 Joshua Motley, a/k/a Scrap,

along with others known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate, and agree to commit wire fraud, in violation of 18 U.S.C. § 1343.

## OBJECT OF THE CONSPIRACY

8. The object of the conspiracy was for the defendants to fraudulently enrich themselves through a scheme and artifice to defraud by obtaining, without authorization, personally identifiable information (PII) belonging to other persons and then using that PII to acquire significant numbers of Apple-branded cellular devices on credit, by charging the devices to customer accounts held in the names of their victims, without the victims' authorization.

9. In total, the scheme encompassed more than 26,000 fraudulent transactions, resulting in an approximate loss of more than $28,000,000.

## MANNER AND MEANS

10. In furtherance of the conspiracy, and to effect the object and purposes thereof, the defendants, and others known and unknown to the grand jury, used the following manner and means, including but not limited to the following:

   a. The members of the conspiracy obtained the names, addresses, social security numbers, and other PII of various persons from internet "dump" websites and other locations through which people buy and sell stolen credit accounts and PII in bulk.

   b. The members of the conspiracy shared the unlawfully acquired PII with each other, often via text message or other means of electronic communication in interstate commerce.

   c. The members of the conspiracy used the unlawfully acquired PII to open customer cellular accounts (or to access already-opened customer cellular accounts) with AT&T. Following the successful completion of a credit check, the members of the conspiracy also added themselves and their associates as "authorized users" on the fraudulent accounts, allowing those individuals to charge devices to the accounts.

4

d. Initially, certain members of the conspiracy obtained fake identification in the names of the victims. However, in the later stages of the scheme, the conspiracy shifted to a "common name" method of identity fraud, whereby they specifically sought out PII for individuals with the same (or similar) names as members of the conspiracy. Setting up accounts and upgrading lines in these "common names" eliminated the needs for fraudulent identification cards, due to the similarity between the names of the victims and the coconspirators.

e. After a member of the conspiracy obtained either accountholder or authorized-user status, the coconspirators (or their associates) then entered one of a variety of retail stores, in a variety of states—most frequently Apple stores but occasionally AT&T stores or other retail chain stores—to "upgrade" the service lines on the accounts and obtain brand new devices (most commonly iPhones, but occasionally other types of cellular devices). These devices were then "charged" to the fraudulent customer cellular accounts or otherwise purchased on credit, with defendants typically needing to pay, at most, a small upgrade fee per device.

f. The members of the conspiracy used a variety of methods to reverse or "clear" the newly added services lines or upgrades from the victim accounts, allowing them to either repeat the previous step of the scheme at another Apple store location, or prolong the overall scheme by delaying the victims' discovery of the scheme. This process typically continued for a given account until AT&T flagged the account and closed it because of suspected fraudulent activity.

g. The members of the conspiracy routinely communicated with one another in real time during the executions of the fraud scheme, with one individual (inside a store fraudulently acquiring devices) texting another individual (providing PII to the first individual to use in answering account-access questions; or clearing lines).

h. The members of the conspiracy employed various methods to gain unauthorized access to AT&T's computer systems for the purpose of creating AT&T accounts, fraudulently adding authorized users, and for clearing the fraudulent upgrades from the service lines. At the beginning of the scheme, this involved the collusive-acquisition or theft of RSA tokens and employee IDs, allowing defendants to later impersonate AT&T retail sales employees while interacting with the

6

AT&T Sales Support Center (known internally at the time as Direct Marketing-Direct Retail, or "DMDR") to open new accounts; the defendants also impersonated retail sales employees in telephone calls with AT&T's Retail Sales and Support "RSS" team to make changes to existing accounts.

i.  As the scheme progressed and AT&T restricted employee tokens to allow access exclusively via AT&T equipment (as opposed to remote-access using personal computing equipment), members of the conspiracy took steps to acquire actual AT&T-networked devices—this included social engineering and sleight-of-hand "swapping" of broken or disabled tablets for active tablets from retail sales employees; the outright theft (or collusive acquisition) of retail sales employees' tablet-computers; and the occasional, strong-armed theft of desktop computer towers from AT&T stores.

j.  Once the members of the conspiracy had acquired devices capable of accessing AT&T's computer systems, the scheme progressed similarly to its prior iteration, with defendants continuing to obtain employee credentials and then opening—or adding users to—accounts directly, using the stolen or otherwise unlawfully-acquired devices.

k. The members of the conspiracy employed a variety of techniques to obtain login credentials, including social engineering (to "shoulder surf" login credentials from retail sales employees during transactions); paying bribes to retail sales employees (to purchase their login credentials); and threats of force or violence (to coerce retail sales employees into giving up their login credentials voluntarily); and on at least three occasions, certain of the defendants used *actual* force to attempt to coerce a retail sales employee to give up their login credentials.

l. Throughout the scheme, to decrease the likelihood of getting caught, coconspirators regularly and routinely sought to work with corrupt AT&T retail store employees. Members of the conspiracy referred to these corrupt employees as "in-stores." The coconspirators identified and worked with "in-stores" employed by several different retail chains, across multiple cities, spanning multiple states.

m. Ultimately, the end goal of the scheme was for the members of the conspiracy to liquidate their fraudulently acquired devices through one or more fences or "plugs," essentially laundering the proceeds of their scheme.

8

11. When using cellular devices (including text messages) to communicate with one another about the scheme—including the sharing of victim-PII— while in different states, the defendants knowingly transmitted and caused to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud.

12. When adding devices and service lines to (or "clearing" devices or service lines from) customer accounts, the defendants knowingly transmitted and caused to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud.

13. When "upgrading," "purchasing," or otherwise charging new cellular devices to victims' customer accounts, the defendants knowingly transmitted and caused to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

14.  In furtherance of the conspiracy, and to effect the object and purposes thereof, the defendants, and others known and unknown to the Grand Jury, committed and caused to be committed various acts, including but not limited to the following:

   a. On or about July 1, 2017, Joshua MOTLEY attempted to fraudulently acquire two Apple iPhone devices (and did fraudulently acquire one such device) from the Galleria Apple Store in Glendale, California.

   b. On or about August 14, 2017, Dominique BARNES acted as a lookout while another individual known to the grand jury fraudulently acquired two Apple iPhone devices from an Apple Store in Irvine, California. BARNES and his companion were subsequently found in possession of 15 fraudulently acquired Apple iPhone devices.

   c. On or about March 2, 2018, Emmanuel LUTER intentionally logged out of an AT&T tablet computer in Arlington, Texas, causing a store employee to re-enter their UserID and password into said tablet while another individual surreptitiously recorded the interaction.

   d. On or about March 25, 2018, Dominque BARNES, Joseph INGRAM, and two individuals known to the grand jury worked together to steal a tablet computer from an AT&T store in Winter Springs, Florida.

10

      BARNES and INGRAM distracted the store employee while the other two individuals swapped a store tablet with a deactivated tablet that they had brought with them into the location. The following day, INGRAM paid the other two individuals $400 each via his Bank of America account.

  e. On or about May 5, 2018, Donnell TAYLOR stole a tablet computer from an AT&T store in Novi, Michigan. As with the prior incident, when the employee appeared to be distracted, TAYLOR swapped the store tablet with a deactivated tablet that he had brought with him.

  f. On or about September 21 & 22, 2018, at a different Apple Store in Novi, Michigan, Dominique BARNES and Joseph INGRAM charged multiple Apple iPhone devices to the accounts of two victims.

  g. On or about November 10, 2018, Emmanuel LUTER provided an individual known to the grand jury with a rental car, which the other individual then used to travel to an AT&T store in Dearborn, Michigan, wherein the individual stole a desktop computer tower.

15.   All in violation of 18 U.S.C. § 1349.

## COUNTS TWO – TWENTY-SIX
(18 U.S.C. § 1028A(a)(1) – Aggravated Identify Theft)

16. Paragraphs 1-15 are incorporated by reference, as though they were set forth fully herein.

17. In furtherance of the above-described conspiracy, and to effect the object and purposes thereof, the defendants and others known and unknown to the grand jury regularly and routinely shared PII (including all or part of a victim's name and Social Security Number) with each other via text or SMS messages. Certain of the defendants communicated with one another directly, but the most frequent means of communication was by way of one or more "group chats." This PII was then used by the recipient(s) to facilitate the fraud scheme outlined above—at times within minutes of receiving the information—either by opening new customer accounts, changing customer account information to add authorized users, adding new service lines, or ultimately charging additional cellular devices to customer accounts.

18. Accordingly, on or about the dates set forth below, the defendants specified below did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit Conspiracy to Commit Wire

Fraud, in violation of 18 U.S.C. § 1349, as set forth in Count One, knowing that the means of identification belonged to another actual person.

19. Each count herein identifies one defendant who either sent a text message transferring the specified means of identification; or authored a "note" on the respective defendant's cell phone which contained the specified means of identification. In each instance where a defendant is identified as the "sender" of a message, the recipient is another member of the conspiracy:

| Count | Date | Message Sender | Means of Identification | Loss |
|---|---|---|---|---|
| 2. | July 15, 2017 | D-1 Emmanuel Luter | PII of victim C.W.A. | $7,752.00 |
| 3. | July 19, 2017 | D-1 Emmanuel Luter | PII of victim D.Y. | $7,752.00 |
| 4. | Sept. 23, 2017 | D-1 Emmanuel Luter | PII of victim D.F. | $5,394.00 |
| 5. | Sept. 28, 2017 | D-1 Emmanuel Luter | PII of victim S.M. | $3,496.00 |
| 6. | Oct. 24, 2017 | D-1 Emmanuel Luter | PII of victim J.V. | $16,132.00 |
| 7. | Nov. 10, 2017 | D-1 Emmanuel Luter | PII of victim M.D.A. | $1,357.00 |

| Count | Date | Message Sender | Means of Identification | Loss |
|---|---|---|---|---|
| 8. | July 19, 2017 | D-2 Joseph Ingram | PII of victim J.M. | $12,598.98 |
| 9. | July 25, 2017 | D-2 Joseph Ingram | PII of victim A.J. | $9,392.97 |
| 10. | Sept. 30, 2017 | D-2 Joseph Ingram | PII of victim P.C. | $11,987.00 |

| Count | Date | Message Sender | Means of Identification | Loss |
|---|---|---|---|---|
| 11. | Jan. 6, 2018 | D-3 Donnell Taylor | PII of victim A.E. | $3,447.00 |
| 12. | Jan. 6, 2018 | D-3 Donnell Taylor | PII of victim J.R.S. | $13,788.00 |
| 13. | Jan. 8, 2018 | D-3 Donnell Taylor | PII of victim S.I.M. | $6,894.00 |

| Count | Date | Message Sender | Means of Identification | Loss |
|---|---|---|---|---|
| 14. | Jan. 13, 2018 | D-3 Donnell Taylor | PII of victim B.W. | $4,596.00 |
| 15. | Feb. 1, 2018 | D-3 Donnell Taylor | PII of victim D.M. | $9,042.00 |
| 16. | Feb. 13, 2018 | D-3 Donnell Taylor | PII of victim J.T.S. | $4,596.00 |
| 17. | April 9, 2018 | D-3 Donnell Taylor | PII of victim J.L.B. | $2,148.00 |

| Count | Date | Message Sender | Means of Identification | Loss |
|---|---|---|---|---|
| 18. | June 28, 2017 | D-4 Dominque Barnes | PII of victim R.L.J. | $51,828.97 |
| 19. | Dec. 3, 2018 | D-4 Dominque Barnes | PII of victim J.D.G. | $3,647.00 |
| 20. | Dec. 3, 2018 | D-4 Dominque Barnes | PII of victim M.F. | $4,971.95 |

| Count | Date | Message Sender | Means of Identification | Loss |
|---|---|---|---|---|
| 21. | July 31, 2017 | D-5 Delano Bush | PII of victim I.N.G. | $14,683.98 |
| 22. | July 31, 2017 | D-5 Delano Bush | PII of victim L.J.T. | $37,761.98 |

| Count | Date | Note Author | Means of Identification | Loss |
|---|---|---|---|---|
| 23. | Feb. 7, 2018 | D-6 Dalontae Davis | PII of victim J.H.S. | $5,745.00 |
| 24. | Feb. 7, 2018 | D-6 Dalontae Davis | PII of victim D.M.W. | $4,596.00 |

| Count | Date | Note Author | Means of Identification | Loss |
|---|---|---|---|---|
| 25. | July 1, 2017 | D-7 Joshua Motley | PII of victim D.T.F. | $14,810.93 |
| 26. | July 1, 2017 | D-7 Joshua Motley | PII of victim C.G. | $13,566.00 |

20. All in violation of 18 U.S.C. § 1028A(a)(1).

**FORFEITURE ALLEGATION**

21. As a result of the violation(s) of Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud), as set forth in Count One of this indictment, the defendants shall forfeit to the United States any property, real or

14

personal, which constitutes, or is derived from, proceeds traceable to that violation, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461.

22. Such property includes, but is not limited to, a money judgment in an amount to be determined in United States currency and all traceable interest and proceeds for which the defendant is jointly and severally liable. Such sum in aggregate is property representing the proceeds of the aforementioned offense, or money that was involved in the aforementioned offenses, or is traceable to such property, in violation of 18 U.S.C. § 1349.

23. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), if any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1) and 1029(c)(2) and Title 28, United States Code, Section 2461(c).

THIS IS A TRUE BILL.

*s/Grand Jury Foreperson*
Grand Jury Foreperson

DAWN N. ISON
United States Attorney

*s/John K. Neal*
John K. Neal
Chief, White Collar Crime Unit

*s/Ryan A. Particka*
Ryan A. Particka
Assistant U.S. Attorney

Dated:   June 23, 2022

**ORIGINAL**

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| Companion Case Information | Companion Case Number: 18-cr-20641-TGB |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: Terrence G. Berg |
| ☒ Yes    ☐ No | AUSA's Initials: R.A.P  *RAP* |

**Case Title:** USA v. Emmanuel Luter, et al

**County where offense occurred :** Oakland

**Check One:**    ☒ Felony    ☐ Misdemeanor    ☐ Petty

```
  ✓ Indictment/____Information --- no prior complaint.
____Indictment/____Information --- based upon prior complaint [Case number:                    ]
____Indictment/____Information --- based upon LCrR 57.10 (d) [Complete Superseding section below].
```

## Superseding Case Information

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
|  |  |  |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

| June 23, 2022 | Ryan A. Particka |
|---|---|
| Date | Ryan A. Particka<br>Assistant United States Attorney<br>211 W. Fort Street, Suite 2001<br>Detroit, MI  48226-3277<br>Phone:(313) 226-9635<br>Fax:     (313) 226-2873<br>E-Mail address: Ryan.Particka@usdoj.gov<br>Attorney Bar #: |

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.